## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TRADITION MEDIA GROUP, LLC,

               **Plaintiff and
Counter Defendant,**

     v.

US BANK NATIONAL
ASSOCIATION,

               **Defendant and
Counter Plaintiff.**

No. 21-cv-04471

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiff Tradition Media Group owns the rights to two service marks: "MAX CASH" and "MAXCASH." Plaintiff alleges that Defendant U.S. Bank National Association's use of the phrase "MAX CASH" for credit cards they offer infringes upon Plaintiff's common law trademark in violation of the Lanham Act and Illinois law. Before the Court are Plaintiff's and Defendant's respective motions for summary judgment. For the reasons stated below, Defendant's motion is granted, and Plaintiff's motion is denied. Plaintiff's registered trademarks are canceled.

## I.     BACKGROUND

Plaintiff Tradition Media Group (Plaintiff), a loan service company, owns U.S. Trademark Registration rights for the marks "MAXCASH" and "MAX CASH and Design," as well as owns common law rights in the marks "MAX CASH" and

"MAXCASH" for consumer loan brokerage services. (Dkt. 127 at 1; Dkt. 131 at 3–4.) Plaintiff filed this action against Defendant U.S. Bank National Association (Defendant), alleging violations of the Lanham Act, common law service mark infringement, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Illinois Uniform Deceptive Trade Practices Act. (Dkt. 38 at 4–9.) Defendant filed a counterclaim against Plaintiff, seeking to cancel or modify Plaintiff's registered Trademarks and a declaration that Defendant is not infringing Plaintiff's trademarks. (Dkt. 40 at 17–23.)

Plaintiff and Defendant now move for summary judgment on their claims. (Dkts. 103, 109.) Plaintiff seeks summary judgment on Defendant's first and third counterclaims: the cancellation of the "MAXCASH" and "MAX CASH" marks. Plaintiff also seeks to exclude two of Defendant's claimed deductions in the accounting of their profits stemming from its accused activities. (Dkt. 110 at 2–15.) Defendant seeks summary judgment on all of Plaintiff's claims and all its own counterclaims.[1] (Dkt. 103 at 1–2.)

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and

---

[1] Defendant primarily seeks summary judgment on cancellation (Counterclaim V) and only seeks modification (Counterclaim VI) in the alternative.

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment requires "a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. Of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

Plaintiff's Illinois state law claims are based on the same set of facts and analyzed under the same legal standards as its Lanham Act claims. *See Bedrock Mgmt., Inc. v. Peoples Choice Entm't, Inc.*, 2014 WL 4979270, at *2 (N.D. Ill. Oct. 6, 2014). In other words, Plaintiff's state law and Lanham Act claims rise or fall together. *See Walt-W. Enters., Inc. v. Gannett Co.*, 695 F.2d 1050, 1054 n.4 (7th Cir. 1982).

## III. DISCUSSION

The Lanham Act provides, in relevant part, that a plaintiff may bring a civil action against:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activity by another person.

15 U.S.C. § 1125(a)(1). To succeed on a trademark infringement claim, Plaintiff must establish: (1) that its "MAXCASH" and "MAX CASH" marks are protectable; and (2) that Defendant's use of the marks is likely to cause confusion. *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). But a court "doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986). Where a defendant challenges a trademark on the grounds that it is descriptive and not entitled to legal protection, the burden at the summary judgment stage is on the defendant "to provide enough evidence to create no doubt that [the marks] should be classified as descriptive and no genuine dispute of fact exists otherwise." *Box Acquisitions, LLC v. Box Packaging Prods., Inc.*, 32 F. Supp. 3d 927, 935 (N.D. Ill. 2014).

### A. Whether Plaintiff's marks are protectable

Defendant first argues that Plaintiff has no valid rights in the phrase "MAX CASH" and the registrations should therefore be cancelled because it is descriptive. (Dkt. 104 at 7–12.) A trademark is descriptive where "it does more than merely name a brand; it describes the product category to which the brand belongs." *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 483 (7th Cir. 2007). Although a "descriptive mark is not a complete description . . . [,] it picks out a product characteristic that figures prominently in the consumer's decision whether to buy the product or service in question." *Id.* Descriptive trademarks are not protectible if they

4

lack secondary meaning—which is to say they do not become "uniquely associated with the original seller." *Id.*; *see also id.* at 483–84 ("[U]nless and until [a descriptive mark] achieved secondary meaning . . . [,] it could not be a legally protected trademark."); *Timelines, Inc. v. Facebook, Inc.*, 938 F. Supp. 2d 781, 793 (N.D. Ill. 2013) ("Without this secondary meaning associated with a descriptive mark, the mark is not entitled to trademark protection."). We therefore must first determine the proper classification of the mark, and then, if it is descriptive, determine whether it has acquired secondary meaning.

### 1. *Mark classification*

In the Seventh Circuit, trademarks are classified "into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992)). In general, "the level of trademark protection available corresponds to the distinctiveness of the mark." *Id.*

A generic term is one that is commonly used and does not identify any particular source; it is therefore not entitled to any trademark protection. *Id.* (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)). Descriptive marks "describe the ingredients, qualities, or characteristics of an article of trade or a service" and generally are not protectible "because a merely descriptive mark is a 'poor means of distinguishing one source of services from another.' " *Id.*

(quoting *M.B.H. Enters. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980)).[2] Suggestive, arbitrary, and fanciful marks are inherently distinctive and thus "automatically entitled to trademark protection." *Id.* (citing *Two Pesos*, 505 U.S. at 767–68).

Since "MAX CASH" and "MAXCASH" are federally registered marks, they are entitled to a presumption that either: (1) they are not merely descriptive or generic; or (2) they have a secondary meaning. *See Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019). The owner of a registration does not get both of these presumptions—it is one or the other. *See id.* But where, as here, "the Office registers a mark without requiring evidence of secondary meaning, it is presumed to be inherently distinctive." *Id.* (cleaned up). That said, "the presumption of validity [the] registration creates is easily rebuttable, since it merely shifts the burden of production to the alleged infringer." *Custom Vehicles*, 476 F.3d at 486 (internal citations omitted).

Defendant contends that the "MAX CASH" phrase is descriptive. (Dkt. 104 at 7–12.) Plaintiff responds that the phrase is suggestive and therefore inherently distinctive and protectable. (Dkt. 110 at 3–9.) Courts employ a few tests to aid in discerning "[t]he line between descriptiveness and suggestiveness," as it can be a difficult one to draw. *Uncommon*, 926 F.3d at 419. Courts first look to "how, and how often, the relevant market uses the word in question." *Id.* at 421 (citing *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 497 (7th Cir. 2001)). In this case, the

---

[2] As explained above, a descriptive mark may still be protectable "if it acquires secondary meaning 'in the collective consciousness of the relevant community.' " *Platinum*, 149 F.3d at 727 (quoting *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir. 1996)).

record shows that numerous players in the market use the "MAX CASH" mark. (Dkt. 104 at 10–11.) That "MAX CASH" is used so frequently suggests that the mark is descriptive, not suggestive. *See Uncommon*, 926 F.3d at 421–22 (at least ten competitors using the word "capsule" in the name of their cell phone cases indicates that the mark is descriptive); *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 599 (7th Cir. 2019) ("[N]umerous examples of widespread industry use" of "Sports Fuel" indicates that the term is descriptive); *Bliss Salon Day Spa*, 268 F.3d at 497 (that "many" players in the beauty-care market use "BLISS" in association with their products and services meant that the mark was functionally descriptive).

Courts also use a second test: "the so-called degree-of-imagination test." *Uncommon*, 926 F.3d at 422. If a mark "imparts information directly it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Platinum*, 149 F.3d at 727. Understanding exactly what services a loan company provides with a "MAX CASH" loan requires no great imagination. Plaintiff argues that although the phrase stands for an idea that can be paraphrased as "the greatest possible amount of cash" (Dkt. 124 at 8–9; Dkt. 110 at 7), there is nothing in that idea or concept that directly imparts information about the business of loaning money (Dkt. 124 at 9; Dkt. 110 at 7). The Court disagrees: a customer needs to use no imagination to understand that the phrase "MAX CASH" used by a loan service provider means a place to get the most money—and Plaintiff concedes that that was the message it intended to convey. (Dkt. 127 at 2.)

Courts also look to dictionaries to see if a mark is descriptive. *See Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996). These definitions support the conclusion that "MAX CASH" is descriptive. Merriam-Webster defines "max" as "maximum." *See Max*, Merriam-Webster, https://www.merriam-webster.com/dictionary/max (last visited March 19, 2025). "Cash" is a generic word, defined as "ready money," "money or its equivalent," or as a verb meaning to "pay or obtain cash." *Cash*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cash (last visited March 19, 2025).

As the Seventh Circuit has held, immediately apparent terms that describe characteristics of a product to a potential consumer are merely descriptive. For example, in *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, the term "Thirst Aid" used in connection with Gatorade was held to be descriptive because it described a characteristic of drink as perceived by consumer. 978 F.2d 947, 952 (7th Cir. 1992). Similarly, in *Henri's Food Prods. Co., Inc. v. Tasty Snacks, Inc.*, the term "tasty salad dressing" was descriptive because "tasty" described the quality of, rather than type of, the product at issue. 817 F.2d 1303, 1306–07 (7th Cir. 1987). So too here, where "MAX CASH" describes the characteristics of a loan rather than a type of loan.

Defendant has presented sufficient evidence to overcome the presumption that "MAX CASH" is a valid, protectable mark, and the Court holds that it is in fact descriptive.

### 2. Secondary meaning

Because "MAX CASH" is descriptive, it must have a secondary meaning to be validly registered. *See Uncommon*, 926 F.3d at 424. A secondary meaning is "a link in the minds of consumers between the marked item and its source." *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010). In other words, a secondary meaning exists when consumers "uniquely associat[e]" the mark with a single maker. *Two Pesos*, 505 U.S. at 766 n.4; *see also Platinum*, 149 F.3d at 728 ("A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the word, term, name, symbol, or device has come to mean that those products or services are the company's trademark.") (cleaned up).

Courts must consider "several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Platinum*, 149 F.3d at 728 (internal citation omitted). Courts place these categories into two groups: "direct evidence" and "circumstantial evidence." *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989). The two direct evidence factors are: (1) direct consumer testimony; and (2) consumer surveys. *Id.* These constitute "the chief inquiry with respect to secondary meaning." *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 577 (N.D. Ill. 1994). Circumstantial factors include: (1) amount and manner of advertising; (2) the sales volume; (3) length and manner of use; (4) established place in the market; and

(5) proof of intentional copying. *Id.* Circumstantial evidence alone, however, is "often insufficient to establish secondary meaning." *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992); *see also Platinum*, 149 F.3d at 728 (the absence of direct evidence "weighs against" a finding of secondary meaning); *Waukesha Floral & Greenhouses, Inc. v. Possi*, No. 15-CV-1365, 2018 U.S. Dist. LEXIS 91471, at *27 (E.D. Wis. June 1, 2018).

It is Plaintiff's burden to show that "MAX CASH" has a secondary meaning attached to it, or at the least to demonstrate that a genuine issue of material fact exists as to the secondary meaning of the mark. *Uncommon*, 926 F.3d at 424–25. Plaintiff presents no direct evidence as to a secondary meaning; rather, Plaintiff takes issue with the direct evidence provided by Defendant. (Dkt. 124 at 13–15.)[3] Plaintiff instead argues that it has submitted sufficient evidence on the circumstantial factors that suggests material issues of fact exist. (*Id.* at 12–17.)

Plaintiff's proffered circumstantial evidence is not sufficient to create a genuine issue of material fact as to secondary meaning. As to the first circumstantial factor, the amount and manner of advertising, Plaintiff contends that, between 2009 and 2020, Plaintiff spent over $831,000 on advertising generally, not on "MAX CASH" specifically. (*Id.* at 15.) For support, Plaintiff cites a declaration from Patrick McDermott, in he states that, "Based on the corporate records of TMG and QuadW, between 2009 and 2020, TMG and QuadW together spent over $831,000 on

---

[3] Plaintiff also contends that since the USPTO did not require any evidence of a secondary meaning, none is required here. (Dkt. 144 at 2–7.)

advertising, though the more recent years represent the highest percentage of that amount." (Dkt. 129 ¶ 8.) This statistic is insufficient for a reasonable jury to find that the marks at issue have developed secondary meaning. Not only is the amount per-year in ad spending relatively small, but Plaintiff provides no documentary evidence to support this statistic and no evidence of what these advertisements were, beyond stating that they were click advertisements on Google, Bing, and Facebook. (Dkt. 124 at 14.) This high-level ad description, without detail such as how the mark was used, falls short.

Plaintiff likewise presents insufficient evidence as to the second factor, the volume of sales. Plaintiff cites to the number of entries in its customer database, which between 2013 and December 1, 2020 consisted of 802,000 entries. (Dkt. 124 at 15.) This number, however, does not represent Plaintiff's volume of sales; rather, it appears to represent a database of potential customers whose personal information was collected by Plaintiff. (*See* Dkt. 129 ¶ 9; Dkt. 135 ¶ 15.) Once collected, Plaintiff passes off this information as leads to partner lenders. (Dkt. 129 ¶ 9.)

This process of collecting personal information does not necessarily employ the marks at issue. Plaintiff admits that it in part uses 600 "affiliates" to refer potential customers to it, that those affiliates are not allowed to use the "MAX CASH" mark, and that the affiliates "try to get consumers to enter personal information on their websites and then provides that consumer information to TMG." (Dkt. 135 ¶ 27.) As a result, Plaintiff provides insufficient information for a jury to find conclude that these 802,000 entries support a finding of secondary meaning, namely because

11

Plaintiff cannot quantify how many of these leads were even consciously exposed to the marks at issue. This is not, as Plaintiff argues, evidence that Plaintiff has 802,000 "customers." (Dkt. 124 at 16.) Looking to more solid evidence of sales volume, it is undisputed that Plaintiff brokered an average of roughly 5,600 loans per year between 2015 and 2020. (Dkt. 135 ¶ 35.)[4]

With regard to the third factor, length and manner of use, Plaintiff contends that, along with its sibling company QuadW International, they have offered loan services under the mark "MAXCASH" since 2009 and that the mark has been public facing, as potential customers receive messages that "it is MAXCASH that is working to find them a loan." (Dkt. 124 at 13.) But as noted, it is undisputed that many of those whom Plaintiff regards as "customers" initially entered their information to third parties that did not identify under the relevant marks.

With respect to the fourth factor, the established place in the market, Plaintiff contends that they are one of the largest loan brokers in the auto title loan, personal loan, and installment loan industry. (*Id.* at 16.) Plaintiff, however, proffers no evidence to establish its market share, and the only evidence for its place in the market appears to be the opinion of one of its own managing members. (Dkt. 129 ¶¶ 11–13.)

Regarding the fifth factor, proof of intentional copying, Plaintiff asserts that third parties have copied its mark. (Dkt. 124 at 16–17.) This factor, however, concerns

---

[4] Plaintiff admits it brokered the following number of loans per year: 2015 (2,096 loans); 2016 (3,429 loans); 2017 (5,494 loans); 2018 (4,851 loans); 2019 (6,156 loans); 2020 (11,397 loans). (*Id.*)

copying by a defendant with intent to confuse, not copying done by third parties. *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 663 (7th Cir. 1995) ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's."). Plaintiff does not argue that Defendant copied the marks with an intent to pass off its product as Plaintiff's.

Plaintiff, in sum, fails to present sufficient facts or evidence that leads to the conclusion that "MAX CASH" has a secondary meaning, or to which a reasonable jury could find that "MAX CASH" has acquired secondary meaning. Absent a survey or consumer declarations, Plaintiff relies on the fact that it operated a public-facing business, spent some resources on click advertising, contacted leads, and brokered roughly 5,600 loans per year between 2015 and 2020. Plaintiff essentially asks the Court to assume the evidence Plaintiff needed to supply: that a substantial number of consumers associated "MAX CASH" as coming from a single source. *See Spraying Sys. Co.*, 975 F.2d at 393. On this record, no factfinder could reasonably determine that a substantial number of consumers think of "MAX CASH" as the product of one loan service provider. As a result, Plaintiff's descriptive marks are not protectable, and the Lanham Act claims must fail.

Because the same analysis applies for Plaintiff's vicarious service mark infringement claim (Count III), unfair competition claim (Count IV), and common law trademark infringement claim (Count V), Plaintiff cannot prevail on these claims either. *See Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001). Plaintiff's claim under the Illinois Deceptive Trade Practices Act

(Count VI) also fails, as Illinois courts resolve these claims under the same standard as the Lanham Act. *See MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998). Plaintiff's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII) also fails, as Illinois courts resolve these claims under the same standard as the Lanham Act. *See Spex*, 847 F. Supp. at 579.

### 3.  Trademark cancellation

Under the Lanham Act, a court can cancel a trademark or order the USPTO to do so. *See TE-TA-MA Truth Found.-Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 665–66 (7th Cir. 2002); *see also Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles*, 2012 WL 3686776, at *11 (N.D. Ill. 2012) ("Pursuant to 15 U.S.C. § 1119, federal courts may cancel registration of a trademark when warranted."). As the Seventh Circuit has made clear, where "a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course." *Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007).

District courts "can cancel registrations during infringement litigation" as a remedy for the plaintiff's claims or the defendant's counterclaims. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 155 (2015). If a trademark has been registered for five years or longer, it is considered "incontestable." 15 U.S.C. § 1065.[5] But if a trademark is fewer than five years old, it may be cancelled for any reason that would have sufficed to deny its initial registration. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 946 (Fed. Cir. 2000). Plaintiff filed to register the mark

---

[5] A court may cancel an incontestable trademark for only a limited set of reasons. *See id.* §§ 1065, 1115(b).

"MAX CASH" in June 2018, and the USPTO registered it on March 17, 2020. In addition, Plaintiff filed to register the mark "MAXCASH" in June 2018, and the USPTO registered it on March 17, 2020. By statute, these trademarks are not incontestable as a matter of law because, although they have been registered for a little over five years, their validity is the subject of this pending "proceeding involving [Plaintiff's] rights," 15 U.S.C. § 1065(2), and "five years of use ha[ve] not passed between the registration and [Defendant's] counterclaim[.]" *Uncommon*, 926 F.3d at 419 n.3. The Court therefore cancels the marks because: (1) they are descriptive marks; (2) that lack secondary meaning; and (3) are not incontestable. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985).

### B. Likely to cause confusion

Although the Court need not address the second element of a common law infringement claim, namely whether Defendant's use of the "MAX CASH" or "MAXCASH" marks are likely to cause confusion, the Court will, for the sake of completeness, addresses this issue. Likelihood of confusion is a "factual determination" based on an "equitable balancing test." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). Courts generally examine seven factors:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of defendant to palm off his product as that of another.

*Id.* at 1043–44 (internal quotation marks omitted). No single factor is dispositive, and the Court may assign varying weights to each of the factors, but three factors are considered "particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *Id.* at 1044.

### 1. Similarity of the marks

When assessing the similarity between the parties' marks, the Court analyzes the marks as a whole and determines "whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008). Plaintiff argues that the marks are highly similar. (Dkt. 124 at 23–24.) In support, Plaintiff points to, not an image comparing the marks in question, but rather simply the words. (*Id.* at 23–24.) Defendant argues that Plaintiff fails to address the similarities of the marks as they appear to consumers when presented in commerce. (Dkt. 143 at 21–22.) Defendant uses the images comparing the marks to support its argument. (*Id.* at 22.)

In the Seventh Circuit, a court "must compare the marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (cleaned up). As a result, the test is "whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Id.* This comparison, at heart, lies with the "*labels* rather than simply the trademarks." *Id.* (emphasis in original). In other words,

courts should not examine the "trademarks in isolation" but rather "the labelling as a whole." *Id.* at 727.

The marks do not appear to share similar fonts. Plaintiff's mark displays the "MaxCash" mark by itself above the words "Title Loans," with the "MaxCash" mark far larger in font than "Title Loans."



(Dkt. 104 at 22.) Defendant's mark, on the other hand, displays "Max Cash" in a small font in a string of words "Visa Max Cash Preferred Card." (*Id.*)



Defendant's mark is also towered over by the phrase "Cozy up with extra cash." (*Id.*) These marks, viewed in context, are starkly different and unlikely to cause customers any confusion. *Sorensen*, 792 F.3d at 727 ("Simply put, the overall commercial impression of the two bottles is quite distinct."). This factor weighs in favor of Defendant.

> ### 2. *Intent of Defendant*

Next up is whether Defendant intended to palm or pass off the Plaintiff's marks as its own. "Passing off" is "trying to get sales from a competitor by making consumers think they are dealing with that competitor, when actually they are buying from the passer off." *Liquid Controls Corp.*, 802 F.2d at 940. In the infringement context, " 'intent' refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." *Roadget Bus. Pte.*

*Ltd. V. PDD Holdings Inc.*, 2023 WL 4865005, at *5 (N.D. Ill. July 31, 2023). Plaintiff concedes that Defendant is not trying to "pass off" their product as their own. (Dkt. 124 at 28.) This factor thus weighs heavily in favor of Defendant.

### 3. *Actual confusion*

As to whether Plaintiff has provided evidence of actual confusion, such evidence, if available, is "entitled to substantial weight in the likelihood of confusion analysis, but this evidence is not required to prove that a likelihood of confusion exists." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001) (cleaned up). But evidence of actual confusion is considered particularly important to the Court's analysis of the likelihood of confusion. *Barbecue Marx*, 235 F.3d at 1044. In determining whether a plaintiff has presented evidence of actual confusion, the Court is "concerned . . . with evidence of actual confusion, not a mere risk of confusion." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000).

Evidence "of actual confusion often takes the form of a consumer survey, but [Plaintiff] has not conducted any such survey." *SFG, Inc. v. Musk*, 2019 WL 5085716, at *11 (N.D. Ill. Oct. 10, 2019). Instead, Plaintiff offers three isolated instances of actual confusion (a generous description) in the over two years that Defendant has produced the credit cards at issue; that is far from what is required to support a likelihood of confusion. *See Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 521 (N.D. Ill. 2011) ("[I]isolated, anecdotal evidence of actual confusion typically does not support a finding of likelihood of confusion. . . ."). This factor thus weighs in favor of Defendant.

### 4.    *Similarity of the product*

Similarity of products as a factor in the likelihood of confusion analysis considers "whether the parties' products are the kind the public might very well attribute to a single source." *AutoZone*, 543 F.3d at 931 (cleaned up); *see also Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990) (trademark protection extends to "such other [products and services] as might naturally or reasonably be expected to come from [it]" (internal quotation marks omitted)). The parties do not need "to be direct competitors or sell the same products and services; it is enough for customers to believe that the infringing product could be from the same party." *Roadget*, 2023 WL 4865005 at *4. Plaintiff and Defendant concededly do not offer the same services, and the products at issue are admittedly different. This factor is, at best, neutral.

### 5.    *Area and manner of concurrent use*

As to "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties," *CAE*, 267 F.3d at 681 (cleaned up), Plaintiff contends that the parties are in direct competition. Plaintiff argues that this is so because credit cards *can* be used to borrow money just like the various loans offered by Plaintiff, and the parties both use the internet to promote their services. (Dkt. 124 at 25–26.) This is insufficient. Plaintiff's failure to present evidence of any relationship in either use or distribution counters any weight of the fact that both parties use internet to promote its product provides. This factor thus weighs in favor of Defendant.

6. *Degree of consumer care*

For the degree of consumer care factor, the Seventh Circuit has instructed that "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE*, 267 F.3d at 683. Plaintiff fails to present any evidence on this point, so the Court finds this factor waived. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Even if Plaintiff has not affirmatively waived this factor, the lack of evidence makes it, at best, neutral.

7. *Strength of the marks*

A final consideration is the strength of the marks. The " 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *Sorensen*, 792 F.3d at 731 (quoting *CAE*, 267 F.3d at 684). Unsurprisingly, the "stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933 (internal quotation marks omitted). A mark's strength ordinarily corresponds to its economic and marketing strength. *Id.*

Plaintiff has presented little evidence demonstrating the strength of the "MAX CASH" mark. To be sure, Plaintiff supports its claims about the economic strength of its marks with the conclusory statement of "the millions of potential customers who have interacted with and received communications from [Plaintiff] under that name" (Dkt. 124 at 27), but Plaintiff has offered no consumer surveys or testimony regarding

the public's awareness of the mark or sales data showing that products bearing the mark are so widely sold that a jury could infer that many consumers are aware of the mark. Plaintiff may very well have gained some status or notoriety over 11 years, but that does not carry the day. Plaintiff's evidence is insufficient. This factor thus weighs in favor of Defendant.

*        *        *

In summary, all of the factors to be considered in assessing the likelihood of confusion issue either weigh in favor of Defendant or are neutral. Accordingly, Plaintiff has not demonstrated a triable issue concerning likelihood of confusion, and Defendant is thus entitled to summary judgment on this independent and adequate basis.

## IV.  CONCLUSION

Defendant's motion for summary judgment (Dkt. 103) is granted, and Plaintiff's partial motion for summary judgment (Dkt. 109) is denied. The Court cancels Plaintiff's "MAX CASH" and "MAXCASH" Trademarks.

SO ORDERED in No. 21-cv-04471.

Date: March 27, 2025

_____
JOHN F. KNESS
United States District Judge